**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


| | | |
|---|---|---|
| **GLOBAL INTERNATIONAL MARINE, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 09-6233 w/ 09-6459** |
| | * | |
| **US UNITED OCEAN SERVICES, LLC, ET AL.** | * | **SECTION "L" (4)** |


**FINDINGS OF FACT & CONCLUSIONS OF LAW**

**I. BACKGROUND AND PROCEDURAL HISTORY**

These consolidated cases arise out of a collision between the M/V TITAN and the T/B
NICOLE C, on the one hand, and the M/V NAIDA RAMIL and the T/B PEGGY PALMER, on
the other, on September 21, 2008. The collision between these vessels occurred in the
Mississippi River near Mile 113 above Head of Passes. At all relevant times, Plaintiff Global
International Marine, Inc. (hereinafter "Global") owned and operated the M/V TITAN and the
T/B NICOLE C, and Plaintiffs National Union Fire Insurance Company of Pittsburgh, Pa., and
Continental Insurance Co. (collectively "the Underwriters") were the subrogated hull insurers
and the collision liability insurers of Global. In addition, at all relevant times, Defendants U.S.
United Ocean Services LLC and United Maritime Group LLC (collectively "United") owned and
operated the M/V NAIDA RAMIL and the T/B PEGGY PALMER.

On September 10, 2009, Global filed suit against United, and on September 22, 2009, the
Underwriters did the same.[1] In its Complaint, Global alleged that United is liable to it for the

---

[1] The Underwriters also filed suit against the M/V NAIDA RAMIL *in rem*. For ease of
reference, the United entities will be collectively referred to as "United."

1

uninsured losses that Global sustained. Meanwhile, the Underwriters averred that United is liable to them, as the subrogated hull insurers of Global, for the amount remitted by the Underwriters to Global for property damages caused by the collision. In response, United denied liability and filed counterclaims against both Global and the Underwriters. In particular, United identified the Underwriters as the collision liability insurers of Global and alleged that they are liable to it for the damages that it sustained as a result of the collision. On October 2, 2009, the Court entered an order consolidating the two cases.

Shortly before trial, the parties were able to reach an agreement regarding the essential facts surrounding the collision, which they set forth in the proposed pre-trial order. However, Global and the Underwriters were unable to come to an agreement on whether the Underwriters could enforce their subrogation rights under the circumstances at issue. The parties agreed to submit the matter to the Court and file, along with the stipulated facts in the proposed pre-trial order, memoranda addressing the subrogation dispute. The Court has carefully reviewed the memoranda, the stipulated facts, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

**II. FINDINGS OF FACT**

1. Global International Marine, Inc. (hereinafter "Global") is a limited liability company organized under the laws of Louisiana, and its principal place of business is in Houma, Louisiana. At all relevant times, it was the owner and operator of the M/V TITAN and the T/B

NICOLE C.

2. U.S. United Ocean Services, LLC and United Maritime Group, LLC (collectively "United") are limited liability companies organized under the laws of Florida, and they have their principal place of business in Tampa, Florida. At all relevant times, United was the owner and operator of the M/V NAIDA RAMIL and T/B PEGGY PALMER.

3. National Union Fire Insurance Co. of Pittsburgh, Pa., is a limited liability insurance company that is organized under the laws of New York and that has its principal of business in New York, New York. Continental Insurance Company is a limited liability insurance company that is organized under the laws of Pennsylvania and that has its principal place of business in Chicago, Illinois.

4. At all relevant times, National Union and Continental (collectively "the Underwriters") provided, as part of an insurance package, various forms of insurance to Global in respect of the M/V TITAN and the T/B NICOLE C. The insurance broker was McGriff, Seibels & Williams of Missouri, Inc., which has its principal place of business in St. Louis, Missouri.

5. The insurance policy includes hull insurance, which covers physical damage to the vessels, but not loss of use. The hull of the T/B NICOLE C was valued at and insured for $2,440,000. The insurance policy also contains collision liability insurance. Under that provision, the Underwriters are to assume the liability of Global for damages sustained by others as a result of collisions with the insured vessels.

6. The insurance policy provides for a single deductible of $25,000 in the aggregate for all claims that arise out of one occurrence. It also provides that the Underwriters "shall be subrogated to all the rights which the Assured may have against any other person . . . in respect

to any payment made under this policy, to the extent of such payment . . . ."

7. On September 21, 2008, a collision occurred in the Mississippi River near Mile 113 above Head of Passes in the area known as "Kenner Bend" between the T/B PEGGY PALMER, then under tow of United's tug M/V NAIDA RAMIL, and the T/B NICOLE C, then under tow of Global's tug M/V TITAN.

8. As a consequence of the collision, United sustained damages in the amount of $651,138.50, and Global sustained damages in the amount of $260,209.23. The damages sustained by Global consists of $172,429.23 in property damages and $87,780.00 in loss of use.

9. Following the incident, the Underwriters paid $147,429.23 to Global under the hull insurance provision of the policy. This represents the amount of property damages sustained less the $25,000 deductible.

10. The proportional fault of the M/V TITAN, owned and operated by Global, in causing the collision and the ensuing damages is 63 percent. The proportional fault of the M/V NAIDA RAMIL, owned and operated by United, in causing the collision and the ensuing damages is 37 percent.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

The Court has subject-matter jurisdiction over these consolidated cases pursuant to 28 U.S.C. § 1333, which confers on the federal district courts original jurisdiction over admiralty and maritime claims. Venue is proper under 28 U.S.C. § 1391.

### B. Apportionment of Liability and the Subrogation Dispute

In *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397 (1975), the Supreme Court

4

discarded the rule of divided damages in maritime collision cases and held that when more than

one vessel is at fault in a collision, "liability for [the] damages is to be allocated among the

parties proportionately to the comparative degree of their fault," *id.* at 411; *see also* 2 Thomas J.

Schoenbaum, *Admiralty and Maritime Law* § 14-4 (4th ed. 2004) ("[J]udgments are [to be]

rendered between the parties so that the net amount of damage borne by each party will be in

exact proportion to the degree of fault."). Applying this rule onto the facts set forth above – and

assuming at this time that the Underwriters are out of the picture – the Court concludes that

United is liable for 37 percent of the damages sustained by Global. Thus, United is liable for

$63,798.82 of Global's property damages and $32,478.60 of Global's loss-of-use damages. The

Court also concludes that Global is liable for 63 percent of the damages sustained by United – or

$436,262.80.

      The parties do not disagree, and the Court concludes, that under the collision liability

insurance provision of the insurance policy entered between the Underwriters and Global, the

Underwriters are to assume Global's liability for the damages sustained by United as a result of

the collision. As noted above, this amounts to $436,262.80. In addition, the Court concludes that

Global is entitled to $32,478.60 in loss-of-use damages. Having not insured Global for such

damages, and thus having not paid any sum to compensate Global for such losses, the

Underwriters have not asserted any subrogation claim over that sum. United is therefore to remit

that sum to Global.[2]

---

[2] The Underwriters have suggested that the Court must enter a "net" judgment reflecting
only one sum to which United is entitled and that, as a result, neither Global nor the
Underwriters are entitled to recover anything. The Underwriters have made this observation
apparently because they believe that under *The North Star*, 106 U.S. 17 (1882), claims in a
collision case merge with one another. This is incorrect. In a typical collision case, such as *The*

Global and the Underwriters disagree as to the allocation of the last sum of $63,798.82, which, as noted above, constitutes United's liability for Global's property damages. On the one hand, the Underwriters point to the fact that in accordance with the hull insurance provision of the insurance policy, they have paid Global all of its property damages less the deductible – which, as noted above, amounts to $147,429.23. The Underwriters argue that having made that payment and satisfied all of their obligations under the insurance policy, they are entitled to exercise their subrogation rights with respect to the sum of $63,798.82. The Underwriters stress that it would be improper to allow Global to obtain more than the amount to which it is entitled in light of its comparative fault.

On the other hand, Global rejects the notion that the Underwriters may pursue their subrogation claim. According to Global, Louisiana law entitles it to be "made whole" and to obtain full compensation for all of its losses before the Underwriters may step in. As noted above, Global has sustained losses totaling $260,209.23 as a result of the collision. Toward this, the Underwriters have remitted $147,429.23 to cover the property damages, and United is to remit $32,478.60 for Global's loss-of-use damages. This leaves a gap of $80,301.40. Global contends that under Louisiana law, it is entitled to recover the sum of $63,798.82 in order to cover that gap. Beyond this subrogation dispute, the parties have otherwise agreed that recovery

---

*North Star*, the rules of liability apportionment do yield a judgment that, in effect, provides a net recovery to a party. In this sense, there may be a "single liability." The claims and counterclaims do not merge, however: each must be adjudicated. *See* 2 Schoenbaum, *supra*, § 14-4 (noting that in a collision case, "judgments are rendered between the parties . . . ."). It is safe to say that had the Underwriters recognized that this is the case, they would have readily acknowledged that Global may recover loss-of-use damages and that the Underwriters have made no competing claim over those damages. Indeed, in their Complaint, the Underwriters have limited their subrogation claim to the amount that they paid to compensate for Global's property damages.

in this case should be without interests and without costs.

**C. Whether This Court May Resolve the Subrogation Dispute**

The Court must first address the Underwriters' threshold contention that this Court may not even consider the subrogation dispute because neither Global nor the Underwriters have asserted claims against one another. The Underwriters do not seriously pursue this somewhat curious argument, and the Court does not find that it is persuasive. Indeed, the Underwriters' suggestion overlooks the basic fact that their own claim against United is premised on the very notion that they may exercise their subrogation rights. Thus, while it is true that no claim has been formally interposed between the Underwriters and Global, the issue of whether the Underwriters may pursue subrogation is one that this Court must inevitably decide in order to adjudicate the Underwriters' claim for relief.

In this regard, it should be noted that it is not uncommon for "parties aligned on the same side in the pleadings [to be] drawn into controversy between themselves on an issue that is material to their rights or obligations regarding their common adversary." Restatement (Second) of Judgments § 38 cmt. a (1982). In other words, "[c]laimants against a common obligor may . . . litigate among each other the question of their respective shares or interests in the obligation," even though no pleadings have been interposed between them. *Id.* It is precisely because this situation may arise that the courts have had to specify the circumstances under which "[p]arties who are not adversaries to each other under the pleadings in an action involving them with a third party are [to be] bound by . . . issue preclusion with respect to issues they actually

litigate[d] . . . as adversaries to each other [in that prior action]." *Id.* § 38.[3] In sum, the

Underwriters' own claim for relief requires this Court to make a determination as to whether

they may enforce their subrogation rights under the circumstances of this case. The fact that no

claim has been interposed in between Global and the Underwriters is immaterial.

## D. What Law Is Applicable to the Subrogation Dispute

In *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310 (1955), the

Supreme Court concluded that "the regulation of marine insurance is, in most instances, [a

matter] properly left with the states." *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th

Cir. 1991) (citing *Wilburn Boat*, 348 U.S. at 320). This general principle requires a court that is

presented with a dispute over marine insurance to begin its analysis by making a choice-of-law

determination. *See* 2 Schoenbaum, *supra*, § 19-9 (noting that "[u]nder *Wilburn Boat*, no question

of marine insurance can be determined without first engaging in a choice-of-law analysis"). In

this regard, federal maritime choice-of-law rules, rather than the choice-of-law rules of the forum

state, are those that are applicable. *Great Lakes Reinsurance (UK) PLC v. Durham Auctions,*

*Inc.*, 585 F.3d 236, 241-42 (5th Cir. 2009).

The Fifth Circuit has held that if the parties to a marine insurance policy have chosen a

particular state as providing the applicable law, a court must generally recognize that choice as

---

[3] The Second Restatement of Judgments points out that where parties that are formally aligned on one side of a litigation contest an issue that is "material to their rights or obligations regarding their common adversary," they have an "incentive to litigate the issues arising between them that is equivalent to that between parties whose opposition is defined through pleadings." Restatement (Second) of Judgments § 38 cmt. a. The Restatement states that accordingly, issue preclusion is warranted. *See id.*; *accord Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 844-45 (3d Cir. 1974) (holding that a co-plaintiff must be precluded from re-litigating an issue where it had a full and fair opportunity to do so in the prior action); *Diamond Shamrock Corp. v. Lumbermen's Mut. Cas. Co.*, 416 F.2d 707, 710 (7th Cir. 1969) (same).

"valid and enforceable." *Id.* at 242; *see also Stoot v. Fluor Drilling Servs., Inc.*, 851 F.2d 1514,

1517 (5th Cir. 1988). Such a choice is to be set aside only if it is "unreasonable or unjust," *Great*

*Lakes Reinsurance*, 585 F.3d at 244 – that is, if "the state [whose law is chosen] has no

substantial relationship to the parties or the transaction or [if] the state's law conflicts with the

fundamental purpose of maritime law," *Stoot*, 851 F.2d at 1517; *accord* Restatement (Second) of

Conflict of Laws § 187(2) (1971).

      If the parties to a marine insurance policy have not made a choice of law, however, the

analysis is different. In such a case, the Fifth Circuit has indicated, a court must ascertain which

state has "the 'most significant relationship' to the substantive issue in question." *Albany Ins.*

*Co.*, 927 F.2d at 891 (quoting Restatement (Second) of Conflict of Laws § 188(1) (1971)). To do

so, a court should consider factors such as the place where the policy was negotiated and

formulated, the place where the policy was issued and delivered, the domicile and place of

incorporation of the parties, the location of the subject matter of the policy, and the location of

the loss. *See id.*; *Truehart v. Blandon*, 884 F.2d 223, 226 (5th Cir. 1989); *Transco Exploration*

*Co. v. Pac. Emp'rs Ins. Co.*, 869 F.2d 862, 863 (5th Cir. 1989); *see also* Restatement (Second) of

Conflict of Laws § 188(2).

      After identifying the state that has "the greatest interest in the resolution of the issues,"

*Truehart*, 884 F.2d at 226, a court must then determine whether it ought to adopt the rule of

decision supplied by the law of that state or instead apply federal maritime law. *See Wilburn*

*Boat*, 348 U.S. at 320. The Fifth Circuit has identified three factors that are relevant in this

analysis: a court must consider "(i) whether [there is a] federal maritime rule [that] constitutes

'entrenched federal precedent' . . . , (ii) whether the state has a substantial and legitimate interest

in having its law applied, and (iii) whether the state rule is materially different from the federal rule." *5801 Assocs., Ltd. v. Continental Ins. Co.*, 983 F.2d 662, 665 (5th Cir. 1993) (citing *Albany Ins.*, 927 F.2d at 886). Of these factors, the first is decisive: "[a]bsent a specific and controlling federal rule, cases involving marine insurance contracts are governed by state law." *N. Am. Specialty Ins. Co. v. Debis Fin. Servs., Inc.*, 513 F.3d 466, 470 (5th Cir. 2007).

In this case, the insurance policy does not contain a choice-of-law clause. As a result, the Court must ascertain which state has "the 'most significant relationship' to the substantive issue in question." *Albany Ins. Co.*, 927 F.2d at 891 (quoting Restatement (Second) of Conflict of Laws § 188(1)). A review of the relevant factors indicates that of the various states potentially implicated in this dispute, Louisiana is the state that has "the greatest interest in the resolution of the issue[]." *Truehart*, 884 F.2d at 226. Indeed, Louisiana is the state where the insured, Global, is organized and has its principal place of business. The insurance policy was issued and delivered to Louisiana. In addition, the loss occurred in Louisiana.

The only nexus between New York and this controversy is that National Union is organized under its laws and has its place of business there. Similarly, Pennsylvania and Illinois are connected to this dispute only because Continental is organized under Pennsylvania law and has its principal place of business in Illinois. Finally, Missouri may be more strongly implicated in this dispute, but this is so only because the insurance broker is based in that state. Thus, the connection between this dispute and New York, Pennsylvania, Illinois, and Missouri is far less substantial than that which exists with respect to Louisiana. In light of this, and given that the Underwriters have not suggested anything to the contrary, the Court finds that Louisiana is the state that, in relative terms, has "the 'most significant relationship' to the substantive issue in

10

question." *Albany Ins. Co.*, 927 F.2d at 891 (quoting Restatement (Second) of Conflict of Laws § 188(1)).

The remaining question is whether it is Louisiana law or federal maritime law that must be applied to resolve the subrogation dispute. As previously noted, the Court must consider whether there is a set of "specific and controlling federal admiralty rules" on the subject in question. *N. Am. Specialty Ins.*, 513 F.3d at 470. The answer to this question is no. The field of subrogation is "extensive and complicated," 16 Couch on Insurance § 222:4 (3d ed. 2010), and as the Fifth Circuit has acknowledged, there are at least two possible approaches to determining priority in recovery as between a subrogated insurer and the insured, *see New Orleans Assets, LLC v. Woodward*, 363 F.3d 372, 374 (5th Cir. 2004). One the one hand, a rule might accord priority to the insured by requiring that an insured be made whole before the insurer can enforce its subrogation rights. *See id.* On the other hand, a rule might provide priority to the insurer by allowing the insurer to enforce its subrogation rights in all circumstances. *See id.*

The "made whole" rule raises two sets of subsidiary questions. First, a court must determine what constitutes the loss for which the insured needs to be "made whole" before the insurer can enforce its subrogation rights. This, in turn, raises two further questions. First, a court must decide whether the inquiry must be focused on the element of damages covered by the insurance policy or whether the inquiry must consider all elements of damages. On the one hand, a court might insist that "the test of wholeness depends upon whether the insured has been completely compensated for all the elements of damages, not merely those damages for which the insurer has indemnified the insurer." *E.g.*, *Rimes v. State Farm Mut. Auto Ins. Co.*, 316 N.W.2d 348, 355 (Wis. 1982). On the other hand, a court might conclude that the insured is

"made whole" once it is compensated for the element of damages that is covered by the insurance policy and that is thus the subject of the insurer's subrogation claim. *See, e.g.*, *Ludwig v. Farm Bureau Mut. Ins. Co.*, 393 N.W.2d 143, 145 (Iowa 1986).

Second, there is the additional question of whether an insured's contributory negligence is relevant in determining the loss for which the insured is entitled to be "made whole." That is, a court must determine whether the insured is "made whole" for the purpose of subrogation when it receives all of the damages that it seeks or whether the insured is "made whole" when it receives all of the damages to which it is legally entitled. *See, e.g.*, *Sorge v. Nat'l Car Rental Sys., Inc.*, 512 N.W.2d 505, 509 (Wis. 1994) (holding that in determining the loss for which the insured is entitled to be made whole, contributory negligence must be taken into account). As these questions illustrate, "defining the term 'made whole' [can be] difficult." Jeffrey A. Greenblatt, Comment, *Insurance and Subrogation: When the Pie Isn't Big Enough, Who Eats Last?*, 64 U. Chi. L. Rev. 1337, 1360 (1997).

The second set of subsidiary questions raised by the "made whole" rule concerns whether the parties may contract around the "made whole" rule to afford the insurer priority in obtaining recovery from a third-party tortfeasor. One the one hand, a rule could provide that parties cannot contract around the "made whole" rule. *See, e.g.*, *Franklin v. Healthsource of Ark.*, 942 S.W.2d 837, 840 (Ark. 1997). On the other hand, a court could allow an insurer and an insured to contract around this rule and thereby give effect to the "insurer priority" principle. *See, e.g.*, *Peterson v. Ohio Farmers Ins. Co.*, 191 N.E.2d 157, 159 (Ohio 1963). Even then, a court might adopt something akin to a clear statement rule and require that the insurer's priority be set forth in a sufficiently explicit manner in the policy before the parties can be deemed to have

12

contracted around the "made whole" rule. *See, e.g.*, *Thiringer v. Am. Motors Ins. Co.*, 588 P.2d 191, 194 (Wash. 1978).

Shortly after the Supreme Court held that marine insurance policies are maritime contracts and thus fall within the federal courts' admiralty jurisdiction, *see New Eng. Mutual Marine Ins. Co. v. Dunham*, 78 U.S. (11 Wall.) 1 (1870), the Court also recognized a marine insurer's right to subrogation, *see, e.g.*, *The Potomac*, 105 U.S. 630, 634 (1881). But perhaps because of "a strong tendency to settle" marine insurance cases, Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 2-2 (2d ed. 1957), even "the most important and obvious [questions] in marine insurance law are rarely litigated," *id.* § 2-8. A review of the relevant case law indicates that as a consequence, the Supreme Court, prior to *Wilburn Boat*, did not appear to have the occasion to articulate a full set of rules governing the priority between a subrogated marine insurer and its insured in obtaining recovery from a third-party tortfeasor. The scarcity of relevant case law has led one court to conclude that for the purpose of *Wilburn Boat*, "there is no judicially established federal admiralty rule addressing [the] subject." *Tampa Port Auth. v. M/V Duchess*, 65 F. Supp. 2d 1299, 1300-01 n.2 (M.D. Fla. 1997).

The Supreme Court case that appears to provide the most recent and the fullest treatment of the question appears to be *Aetna Insurance Co. v. United Fruit Co.*, 304 U.S. 430 (1938). In that case, after the marine insurers had paid all of the amount due under the insurance policies, the insured obtained recovery from the third-party tortfeasor in an amount that was substantially greater than that paid by the insurers, and the insurers sought to enforce their subrogation rights to that greater amount. *Id.* at 432-33. The Supreme Court rejected that claim, observing that if accepted, the insurers' argument would "deprive the insured of indemnity" and mark "a radical

13

departure from the principle on which subrogation is founded." *Id.* at 436. The Court thus took note of, and gave effect to, "the rule that the insurer is entitled to subrogation only after the insured is appropriately indemnified." *Id.* at 438.

Although the Supreme Court has thus suggested that the "made whole" rule is applicable in the context of marine insurance, the contours of the rule under federal maritime law have not been fully delineated. The parties have not cited, and additional research has not uncovered, a case that conclusively resolves, under federal maritime law, the question of how to determine the loss for which the insured is entitled to be made "whole" before the marine insurer can exercise its subrogation rights. And the parties have not pointed to, and research has not revealed, a case that squarely addresses, under federal maritime law, whether a marine insurer and its insured may contract around the "made whole" rule. In sum, there appears to be no established federal maritime rule on these "precise subrogation issue[s]." *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 605 F.2d 1340, 1345 (5th Cir. 1979).

Ordinarily, this Court would further develop what appears to remain an inchoate area of federal maritime law by "look[ing] to state statutory law and to precepts of the common law," 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 4-1 (4th ed. 2004), and by considering English law on this question, *see Queens Ins. Co. of Am. v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487, 493 (1924) ("There are special reasons for keeping in harmony with the marine insurance laws of England."). But it is doubtful that this Court may do so in light of the Supreme Court's decision in *Wilburn Boat*. As noted above, the Court of Appeals has read *Wilburn Boat* to require the application of state law in the absence of "specific and controlling federal admiralty rules," *N. Am. Specialty Ins.*, 513 F.3d at 470, or of "[e]ntrenched federal precedent,"

14

*Thanh Long P'ship v. Highlands Ins. Co.*, 32 F.3d 189, 193 (5th Cir. 1994).

This reading of *Wilburn Boat* in effect freezes judge-made federal maritime law in the field of marine insurance as it stood in 1955 and forecloses any further development of that body of law. In fact, as a logical matter, it even indicates that cases such as *Aetna Insurance* are now obsolete. Indeed, if one were to assume that the state that has "the greatest interest in the resolution of the issues," *Truehart*, 884 F.2d at 226, happens to have adopted the "insurer priority" rule, then this Court cannot simultaneously adhere to the "made whole" principle recognized in *Aetna Insurance* and look for specific rules governing the aforementioned subsidiary questions in the law of that state. Indeed, those rules would be nowhere to be found. Thus, if *Wilburn Boat* does preclude the courts from fashioning any additional federal rules of decision – even ones that supplement an existing general principle – it must also be understood to, in effect, render obsolete Supreme Court decisions, such as *Aetna Insurance*, that do articulate a basic rule of decision, but do not fully address all of the subsidiary questions raised by it.

The Supreme Court's decision in *Wilburn Boat* does not have to be read in this manner. The Court in that case was not confronted with the fact that one of its cases had, in fact, recognized in the context of maritime law a general principle. *See Wilburn Boat*, 348 U.S. at 314 (noting that the only Supreme Court case potentially relevant was one that concerned general commercial law, and not maritime law). Instead, with respect to its own jurisprudence, it was facing a completely blank canvas. *See id.* It was in that context that the Supreme Court declined to fashion a federal rule of decision. *See id.* at 320. The Supreme Court's decision in *Wilburn Boat* thus does not necessarily compel the conclusion that federal courts may not further the

15

development of marine insurance principles that the Supreme Court had recognized and applied prior to *Wilburn Boat*.

The Fifth Circuit has, however, interpreted *Wilburn Boat* to require the application of state law where there are no "specific and controlling federal admiralty rules," *N. Am. Specialty Ins.*, 513 F.3d at 470, or "[e]ntrenched federal precedent[s]," *Thanh Long P'ship*, 32 F.3d at 193. This logically requires the application of state law whenever there is the absence of a full set of rules of decision addressing a marine insurance subject. As noted above, prior to *Wilburn Boat*, the Supreme Court did not have the opportunity to fashion a complete set of rules governing the priority in recovery as between a subrogated insurer and its insured. The absence of "specific and controlling federal admiralty rules" on the subject thus compels the conclusion that the law of Louisiana is applicable to this case. *N. Am. Specialty Ins.*, 513 F.3d at 470.

### E. Resolution of the Subrogation Dispute

Ordinarily, in order "[t]o determine state law, federal courts . . . look to the final decisions of the state's highest court." *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). If the state's highest court has not rendered a decision "on the issue at hand," then "it is the duty of the federal court to determine, in its best judgment, how the highest court of the state would resolve the issue if presented with the same case." *Id.* That is to say, the federal court must make an "*Erie* guess." *Id.*[4] In this regard, a state's intermediate appellate court may supply rules of decision that constitute the "laws of the state [even though]

---

[4] Of course, the Supreme Court's decision in *Erie R.R. Co. v. Thompkins*, 304 U.S. 64 (1938), relates most pertinently to federal courts sitting in diversity, and not in admiralty. There is no reason to believe, however, that the mode of analyzing state law varies according to the basis for the court's subject matter jurisdiction.

the highest court of the state has never passed upon them." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). Accordingly, a federal court generally adheres to the rule of law announced by a state's intermediate appellate court if it has exercised "its considered judgment" in doing so. *Id.* at 237.     Louisiana's "unique Civilian tradition" requires a federal court to adopt a different mode of analysis in determining the contours of the state's law. *Songbyrd, Inc. v. Bearsville Records, Inc.*, 104 F.3d 773, 776 (5th Cir. 1997). At its core, the obligation of a federal court applying Louisiana law "is to the [Civil] Code.'" *E.g.*, *Shelp v. Nat'l Sur. Corp.*, 333 F.2d 431, 439 (5th Cir. 1964). "Judicial decisions," it has long been understood, "are not . . . an authoritative source of law." *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 128 (La. 2000). Instead, they constitute "secondary information." *Ardoin v. Hartford Accident & Indem. Co.*, 360 So.2d 1331, 1334 (La. 1978). In adjudicating a case, "'each judge . . . may consult the civil code and draw anew from its principles.'" *Songbyrd*, 104 F.3d at 776 (quoting Alvin Rubin, *Hazards of a Civilian Venturer in a Federal Court*, 48 La. L. Rev. 1369, 1372 (1988)).[5]

   The Louisiana Civil Code provides that "[s]ubrogation is the substitution of one person to the rights of another." La. Civ. Code art. 1825. "When subrogation results from a [third] person's performance of the obligation of another, that obligation subsists in favor of the [third person],

---

   [5] Because, under the civilian tradition, "a tribunal is never bound by the decisions which it formerly rendered [and] can always change its mind," even the prior decisions of the Louisiana Supreme Court "are [merely] persuasive, [and] not authoritative expressions of the law." *Doerr*, 774 So.2d at 128-29 (quoting 1 Marcel Planiol, *Treatise on the Civil Law* § 123 (La. State Law Inst. trans. 1959) (12th ed.1939)). And the "flexibility" that federal courts have in approaching the decisions of state intermediate appellate courts is correspondingly "greater" in Louisiana. *Green v. Walker*, 910 F.2d 291, 294 (5th Cir. 1990). Even "when a series of decisions form[s] a 'constant stream of uniform and homogeneous rulings having the same reasoning,'" the doctrine of *jurisprudence constante* merely confers on that jurisprudence "'considerable persuasive authority.'" *Doerr*, 774 So.2d at 128 (quoting James Dennis, *Interpretation and Application of the Civil Code and the Evaluation of Judicial Precedent*, 54 La. L. Rev. 1, 15 (1993)).

but is extinguished for the original obligee." *Id.* art. 1826(A). In other words, "the third person is entitled to bring the same action that existed against the obligor since the inception of the obligation." Saul Litvinoff, *Subrogation*, 50 La. L. Rev. 1143, 1146 (1990). The third person is said to "step[] into the shoes of the original [obligee]." *State Farm Mut. Auto. Ins. Co. v. Berthelot*, 732 So.2d 1230, 1232 (La. 1999). The subrogee may not always enforce its right to subrogation, however. Article 1826(B) of the Louisiana Civil Code provides that "[a]n original obligee who has been paid only in part may exercise his right for the balance of the debt in preference to the new obligee." La. Civ. Code art. 1826(B). This provision, it has been widely recognized, embodies the "made whole" rule. *See, e.g.*, *Woodward*, 363 F.2d at 375.

As noted above, the "made whole" rule raises questions as to what constitutes the loss for which the insured is entitled to be made whole. First, there is the question of whether, for the purpose of subrogation, the loss extends only to the element of damages that is covered by the insurance policy and over which an insurer seeks to assert its subrogation rights or whether the loss encompasses all of the elements of damages that an insured might have sustained. Second, there is also the question of whether an insured is made whole, for the purpose of subrogation, when it receives the damages that it seeks or when it obtains the damages to which it is legally entitled. As indicated above, all of these questions demonstrate that the "[a]pplication of the 'made whole' rule [can be] notoriously complex." Restatement (Third) of Restitution and Unjust Enrichment § 57 reporter's note to cmt. h (Tentative Draft No. 6, 2008).

The Civil Code itself appears to be silent as to these critical questions. Article 1826(B) enigmatically refers to "[a]n original obligee who has been paid only in part." *Id.* art. 1826(B). It leaves unanswered the question, "in part of what?" Neither does the former version of Article

1826(B) shed any further light, for it similarly identifies as its object an obligee who "has been paid but in part" without specifying what it is that constitutes the whole. La. Civ. Code art. 2162 (1870). Finally, the parties have not suggested, and a review of the jurisprudence does not reveal, a "constant stream of uniform and homogeneous rulings" on what constitutes the whole for the purpose of Article 1826(B). *Doerr*, 774 So.2d at 128 (quoting Dennis, *supra*, at 15). There is, in other words, no *jurisprudence constante* regarding the meaning of the term "in part."

For instance, it should be noted that on the question of whether an insured's contributory negligence is relevant, the decisions of the Louisiana Supreme Court provide conflicting signals. In *Southern Farm Bureau Casualty Insurance Co. v. Sonnier*, 406 So.2d 178 (La. 1981), which remains the leading case on the "made whole" rule under Louisiana law, the court spoke of "the damages to which the insured is entitled from a tortfeasor." *Id.* at 180. This formulation clearly contemplates that an insured's contributory negligence factors into the determination as to whether, for the purpose of subrogation, the insured has been made whole. In *Egros v. Pempton*, 606 So.2d 780 (La. 1991), however, the court simply referred to "the total amount of damages." *Id.* at 784. This formulation does not distinguish between damages sought by the insured and damages to which the insured is entitled. These different intonations underline the fact that the Louisiana Supreme Court has not had the occasion to squarely confront the question.

Article 10 of the Louisiana Civil Code instructs that "[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." La. Civ. Code art. 10. Accordingly, the Court will examine the purposes that underlie the subrogation articles of the Civil Code. This inquiry, it bears noting, need not be narrowly confined. Indeed, the law of subrogation in Louisiana, and its

19

counterpart in the common-law jurisdictions, share common roots. *See Aetna Life Ins. Co. of Hartford v. Town of Middleport*, 124 U.S. 534, 551 (1888) (noting that the Louisiana Civil Code "is in the main founded on the civil law from which [the] right of subrogation has been adopted by the chancery in this country"); *Rachal v. Smith*, 101 F. 159, 164 (5th Cir. 1900) ("[T]he equitable doctrine of subrogation was ingrafted on the English equity jurisprudence from the civil law.").

Subrogation finds its origins in the context of sureties. *See* Greenblatt, *supra*, at 1339; Litvinoff, *supra*, at 1149-50. There, in order to induce a creditor to make a loan, the surety guarantees the repayment of the loan on the part of the debtor. If the debtor defaults, then the surety makes payment to the creditor. "The debtor is called the primary obligor, the creditor is called the obligee, and the surety is called the secondary obligor." Greenblatt, *supra*, at 1345. The law recognizes, however, that "[a]s between the [primary] obligor and the secondary obligor, it is the [primary] obligor that has the duty to perform or bear the cost of performance." Restatement (Third) of Suretyship and Guaranty § 18 cmt. a (1996). Thus, when the secondary obligor pays the underlying debt, the primary obligor becomes unjustly enriched. *Id.* § 26 cmt. a. By allowing the secondary obligor to then obtain recourse against the primary obligor as if it were the obligee, subrogation helps to preclude unjust enrichment. *See id.*

The concept of subrogation did not become tied to insurance until later.[6] But it is not surprising that subrogation became relevant in the insurance context as well: preventing

--------

[6] For one historical account of subrogation, see, for example, the two-part article: M. L. Marasinghe, *An Historical Introduction to the Doctrine of Subrogation: The Early History of the Doctrine I*, 10 Val. U. L. Rev. 45 (1975); M. L. Marasinghe, *An Historical Introduction to the Doctrine of Subrogation: The Early History of the Doctrine II*, 10 Val. U. L. Rev. 275 (1976).

windfalls is also of central concern in the realm of insurance. For one, "the basis and foundation of all insurance law is 'indemnity,'" the goal of which is "to put an insured in the same (but not better) position the insured would have occupied had no loss occurred." 1 Appleman on Insurance § 3.1 (2d ed. 1996). Under the indemnity principle, "insurance should not provide a party with the means of realizing a net profit when an insured event occurs." *Id.* It is possible, however, that an insured may be able to do so – by first obtaining insurance proceeds from the insurer and then securing damages from the tortfeasor. *See* 16 Couch on Insurance § 222:8 (3d ed. 2010). Thus, "subrogation is needed to preserve the principle of indemnity." 22 Appleman on Insurance § 141.1 (2d ed. 1996).

Like the insured, the third-party tortfeasor might also be unjustly enriched. *See* 16 Couch, *supra*, § 222:8. Having received insurance proceeds, an insured might not pursue an action against the tortfeasor, and the tortfeasor might therefore be relieved of the obligation that the law would otherwise impose on him – to pay for the loss that he, in fact, caused. *See id.* (noting that "in the absence of . . . double recovery by the insured, the third party would go free notwithstanding the fact that he or she has a legal obligation in connection with the damage."). As in the surety context, subrogation in the realm of insurance "compel[s] the eventual satisfaction of an obligation by the one who ought to pay it." Restatement (Third) of Surety and Guarantee § 27 cmt. a. It "ensures that the person who in good conscience ought to pay a loss (the tortfeasor) does in fact pay the loss." 22 Appleman, *supra*, § 141.1.

The notion that one of subrogation's objective is to preclude double recovery on the part of the insured might seem to be in conflict with the collateral source rule, which contemplates the possibility that an insured might retain both its insurance proceeds and damages from the

tortfeasor. *See generally Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994) (explaining the rule under maritime law); *Bozeman v. State*, 879 So.2d 692, 697-701 (La. 2004) (explaining the rule under Louisiana law). This inconsistency is largely illusory, however. Like subrogation, the collateral source rule is aimed at ensuring that third-party tortfeasors "bear[] the costs of their own conduct." *Davis*, 18 F.3d at 1243 n.21; *see also Bozeman*, 879 So.2d at 700-01. It does so by insisting that the overall amount of damages for which the third-party tortfeasor is liable may not be reduced by the amount of insurance proceeds that an insured has received in connection with the tort. *See Davis*, 18 F.3d at 1243; *Bozeman*, 879 So.2d at 698.

As noted above, it is possible that under this rule, an insured might retain both its insurance proceeds and damages from the tortfeasor. It has been widely recognized, however, that "[a]lthough the [collateral source] rule appears to allow a double recovery, . . . typically, the collateral source rule will have a lien or subrogation right that prevents such a double recovery." *E.g.*, *Wills v. Foster*, 892 N.E.2d 1018, 1022 (Ill. 2008); *accord Metoyer v. Auto Club Family Ins. Co.*, 536 F. Supp. 2d 664, 670-71 (E.D. La. 2008). Thus, subrogation is the mechanism by which the possibility of double recovery under the collateral source rule is reduced and even eliminated. In fact, it has been said that one purpose of the collateral source rule is to preserve an insurer's right to subrogation. *E.g.*, Dan B. Dobbs, *Law of Remedies* 268 (2d ed. 1993). The collateral source rule and subrogation work in tandem to force third-party tortfeasors to pay for their conduct. *See, e.g.*, Kyle D. Logue, *Coordinating Sanctions in Tort*, 31 Cardozo L. Rev. 2313, 2320 n.13 (2010) ("Double recovery is avoided, and causal responsibility properly assigned, through the interplay of the subrogation doctrine and the collateral source rule.").

In sum, subrogation "facilitates an adjustment of rights to avoid unjust enrichment." 1

22

Appleman, *supra*, § 3.1. By doing so, subrogation not only helps to satisfy a basic sense of fairness, but also works to achieve important societal goals. In the surety context, it is evident that subrogation helps facilitate the extension of credit on the part of creditors and thus plays an important part in fostering economic activity. In the insurance context, meanwhile, the elimination of windfalls helps to encourage the exercise of care and thus the prevention of loss. If "the insured were to receive more than the amount of his loss," it has been said, the insured "might be encouraged to incur losses." 22 Appleman, *supra*, § 141.1. In other words, permitting double recovery might create a moral hazard by giving the insured an incentive "to use less than reasonable care in preventing or avoiding a covered insurance loss." 1 Appleman, *supra*, § 3.6. A loss-prevention rationale also underlies the insistence that a third-party tortfeasor ought to pay for the loss that it causes. Forcing the third-party tortfeasor to bear the burden of the loss might "deter[] injurious behavior" and might, as a result, encourage that party to exercise reasonable care in the future. Greenblatt, *supra*, at 1341.

The underlying purposes of subrogation help to resolve the debate in which Global and the Underwriters have implicitly engaged. As noted above, the Underwriters have stressed that a distinction must be made between property damages and loss-of-use damages given that it insured only property damages. The Underwriters have also argued that it would be improper for Global to obtain more damages than the amount to which it is entitled in light of its comparative fault. Meanwhile, Global contends that it is entitled to full compensation for all of the losses that it has sustained as a result of the collision, without regard to its comparative fault. The two parties have therefore taken conflicting positions on two of the subsidiary questions raised by the "made whole" rule: first, whether the focus of the "made whole" inquiry should be on the

element of damages covered by the insurance policy; and second, whether the key factor is the amount of damages sought by the insured or the amount of damages to which it is entitled.

In light of the purposes that underlie subrogation, the answer to the first question is in the affirmative: the inquiry as to whether the insured has been "made whole" must be focused on the element of damages that is covered by the insurance policy and over which the insurer seeks to enforce its subrogation rights. *Accord Ludwig*, 393 N.W.2d at 145-47. As noted above, the aim of subrogation in the context of insurance is to guard against double recovery and protect the indemnity principle. Oftentimes, however, an insurer may not cover all of the different elements of damages that might be sustained as a result of an incident. *See id.* at 146. In light of this basic reality, the indemnity principle cannot be meaningfully protected without distinguishing between those elements of damages that are covered by the policy and those that are not.

In response to this recognition, an insured might seek to re-characterize an amount due for one element of its damages as one that is due for another element of its damages. In fact, this is what Global, in effect, has attempted to do in arguing that it is entitled to use the sum of $63,798.82, which is attributable as property damages, to cover the gap of $80,301.40, which consists, in large part, of its loss-of-use damages. Such an effort must be rejected, however. As the Supreme Court of Iowa has observed, to allow an insured to appropriate a sum that is attributable to an insured loss in order to cover an uninsured loss would be to force an insurer to become "an insurer against [uninsured] losses as well." *Id.* at 147. Clearly, this would provide "a windfall for [the] insured who has not paid for" such protection. *Id.*

The fundamental purposes that underlie subrogation also provide a clear answer as to the second question in dispute: the key factor cannot, as Global contends, be the amount of damages

24

sought by the insured. Rather, the focus of the "made whole" inquiry must be on the amount of damages to which the insured is legally entitled. *Accord Sorge*, 512 N.W.2d at 509. To enable an insured to recover all of the damages that it sought – without regard to any contributory negligence on its part – would be to undermine the loss-prevention rationale that underlies not only subrogation, but also the doctrine of comparative fault. Indeed, it would eliminate the incentive provided by the doctrine of comparative fault for parties to exercise reasonable care in conducting their affairs.

Global's suggestion that being "made whole" means receiving full compensation for all of the losses that the insured has sustained is therefore not consistent with the purposes of subrogation. It is not, however, without some foundation. Indeed, in the surety context, the amount sought by the creditor may be the amount with respect to which it must be "made whole" before subrogation can take place. There is, however, never a question as to whether the creditor is at fault or whether the surety may, by satisfying its duty, remit to the creditor an amount greater than that to which the creditor is legally entitled. In the surety context, the amount sought by the creditor and the amount to which it is legally entitled are one and the same. In light of the above, however, it is clear that while it may be the case that in the surety context, "the whole" for which the original obligee is entitled to recover is simply the amount that it seeks, importing such a notion into the context of insurance may defeat the very purposes that underlie subrogation. *Cf. Winkelmann v. Excelsior Ins. Co.*, 650 N.E.2d 841, 844 (N.Y. 1995) (noting that in the context of subrogation, "the rights of sureties and insurers must be distinguished").

In sum, in light of the purposes underlying subrogation, the "whole" to which Article 1826(B) of the Louisiana Civil Code refers must be understood to denote the amount that an

insured is legally entitled to recover with respect to the element of damages over which the insurer has provided insurance and over which it, consequently, has asserted a subrogation claim. Under this definition, an insurer that pays to the insured an amount that exceeds that which the insured is legally entitled to recover with respect to that particular element of the insured's damages may exercise its subrogation rights and proceed against a third-party tortfeasor. Such an insurer may step into the shoes of the insured and recover the amount that the insured itself would be legally entitled to recover. Such an understanding of the "made whole" rule under Article 1826(B) "best conforms to the purpose of the [subrogation] law." La. Civ. Code art. 10.

This understanding of the "made whole" rule does not violate the fundamental principle that "[s]ubrogation cannot injure the insured." *Sonnier*, 406 So.2d at 179. Under this rule, if an insurer pays an amount that is less than the amount to which the insured is legally entitled with respect to the element of damages that is covered by the insurance policy, the insured can recover the remaining amount in preference over the insurer. Thus, this rule is consistent with the notion that subrogation should not "in fact hinder or jeopardize the satisfaction of [the original obligee's] remaining claim against [the original obligor]." Restatement (Third) of Restitution and Unjust Enrichment § 57 cmt. h. It is only when an insured has received from its insurer an amount that is more than the sum to which it is entitled to recover under the law with respect to the specific element of damages that the insurer may enforce its subrogation rights.

Applying the foregoing to this case, the Court concludes that the Underwriters may enforce their subrogation rights over the amount that is in dispute – $63,798.82 in property damages. As noted above, Global sustained $172,429.23 in property damages as a result of the collision, but because it is 67 percent at fault for the collision and the ensuing damages, it is

entitled only to recover 37 percent of its property damages – or $63,798.82. Following the collision, however, the Underwriters remitted the full amount due to Global under the hull insurance provision of the insurance policy – $147,429.23. This amount exceeds that to which Global is legally entitled to recover for its property damages in light of its comparative fault. Accordingly, the Underwriters may enforce their subrogation rights and recover the amount of property damages that Global itself could have recovered. This amounts to $63,798.82.

Global argues that the contrary result is warranted, and it rests its contention entirely on the decision of the Louisiana Court of Appeal in *Fair Grounds Corp. v. ADT Security Systems*, 719 So.2d 1110 (La. Ct. App. 4th Cir. 1998). For several reasons, however, Global's argument is not persuasive. First, it should be noted that at issue in *Fair Grounds* was a factually distinguishable scenario. There, the insured was found to have sustained property damages of around $57 million and to have been 15 percent at fault. *Id.* at 1114. In the aftermath of the incident, the property insurers collectively remitted around $19 million to the insured. *Id.* at 1113. Thus, unlike the Underwriters here, the insurers in *Fair Grounds* provided to the insured an amount less than the sum to which the insured was legally entitled to recover as property damages.

Second, it should be noted that under the conception of the "made whole" rule outlined above, the same result would have been reached in *Fair Grounds*. In that case, after all but one of the insurers settled their claims, *id.* at 1119 n.4, the state intermediate appellate court rejected the last insurer's attempt to enforce its subrogation rights. *Id.* at 1120. This conclusion, it bears noting, is consistent with the fact that the amount remitted by the insurers was less than the amount that the insured was legally entitled to recover. Under the conception of the "made

27

whole" rule discussed above, the insured in *Fair Grounds* would be deemed entitled to recover the remainder in priority over the insurer. The outcome in this case and in *Fair Grounds* are therefore reconcilable. The fact that the insurer in *Fair Grounds* was not allowed to enforce its subrogation claim does not in and of itself compel the conclusion that the Underwriters in this case may not do so as well.

To be sure, as Global observes, the court in *Fair Grounds* did espouse a different line of reasoning in concluding that the insurer could not exercise its subrogation rights. Indeed, the court concluded that before the insurer could enforce its subrogation rights, the insured was entitled to recover all of the property damages that it sought – without regard to its comparative fault. *See id.* at 1120. In reaching this conclusion, however, the court did not provide an explanation as to how such a rule is consistent with the underlying purposes of subrogation. *See id.* Nor did it cite authority for the specific proposition that an insured's comparative fault is not relevant. *See id.* The court in *Fair Grounds* merely indicated that its conclusion was broadly consistent with that of the Louisiana Supreme Court in *Sonnier*. *See id.* at 1119-20.

*Sonnier* does not, however, compel the conclusion that an insured's comparative fault is irrelevant. There, the insured had received a payment from the insurer in the amount of $2,758.40 for funeral expenses. *Sonnier*, 406 So.2d at 179. Following a jury trial, the insured obtained a judgment of $103,160 against the tortfeasor, including $3,160 for funeral expenses, but the case was settled for $90,000 while it was on appeal. *Id.* at 179-80. The insurer sought to recoup the amount it paid to the insured, and the Louisiana Supreme Court held that the insurer could not do so. *Id.* at 181. In reaching this conclusion, however, the court did not explicitly address the issue of whether the focus of the inquiry should be on the damages sought by the

insured or by the damages to which it is entitled. *See id.* Thus, *Sonnier* does not mandate the idea that the relevant measure of wholeness is the amount of damages sought by the insured. If anything, the *Sonnier* court's reference to "the damages to which the insured is entitled from a tortfeasor" suggests that an insured's comparative fault must be taken into account. *Id.* at 180.

Ultimately, the idea, endorsed in *Fair Grounds*, that the measure of wholeness is simply the amount of damages sought by the insured may find some support in the fact that in the surety context, the measure of wholeness is the amount sought by the creditor. As discussed above, however, with respect to sureties, the amount sought by the creditor and the amount to which it is legally entitled are one and the same. In the insurance context, in contrast, the doctrine of comparative fault may cause the two amounts to be different, and in light of the fundamental purposes of subrogation, the measure of wholeness must be the amount of damages to which the insured is legally entitled, not simply the amount sought by the insured. Having not explained how the rule it favors can be reconciled with the purposes of subrogation, Global has not persuaded this Court that it must follow the conclusion in *Fair Grounds* that an insured's contributory negligence is irrelevant.

Finally, it is worth mentioning that in Louisiana, jurisprudence, even when it achieves the status of *jurisprudence constante*, merely constitutes persuasive or "secondary information." *Ardoin*, 360 So.2d at 1334. The obligation of a federal court applying Louisiana law is to the Civil Code, *Shelp*, 333 F.2d at 439, and in line with that duty, "'each judge . . . may consult the civil code and draw anew from its principles,'" *Songbyrd*, 104 F.3d at 776 (quoting Rubin, *supra*, at 1372). Having thus reviewed the subrogation articles of the Civil Code, and the purposes that underlie them, this Court is convinced that under the circumstances of this case,

the Underwriters may properly enforce their subrogation rights over the sum of $63,798.82. *Fair Grounds* does not, of its own force, mandate the contrary result.

In summary, the dispute as to whether the Underwriters may enforce their subrogation rights must be resolved in order for this Court to adjudicate the Underwriters' claim for relief. Under the Supreme Court's decision in *Wilburn Boat*, Louisiana law applies to the dispute. And in light of the purposes that underlie the subrogation articles of the Civil Code, the inquiry as to whether an insured has been made whole for the purposes of subrogation must be focused on the element of damages covered by the insurance policy and on the amount that the insured is legally entitled to recover. Thus, an insurer that has paid to an insured an amount that exceeds that which the insured is legally entitled to recover may exercise its subrogation rights and proceed against a third-party tortfeasor. In this case, the Underwriters have, by discharging their obligation under the hull insurance policy, remitted to Global a sum of $147,429.23 for Global's property damages. Because this exceeds the sum to which Global is entitled to recover for its property damages, the Underwriters may enforce their subrogation rights and recover $63,798.82 from United.[7]

## IV. CONCLUSION

On the basis of the above Findings of Fact and Conclusions of Law, the Court finds that

---

[7] In light of the above, it is not necessary for this Court to determine the extent to which, under Louisiana law, an insurer and an insured may contract around the "made whole" rule. Nor is it necessary to address the Underwriters' argument that if *Fair Grounds* provides an authoritative statement of Louisiana law, it is inconsistent with the doctrine of comparative fault under maritime law and that accordingly, under *Wilburn Boat*, Louisiana law should not be applied to this subrogation dispute. The Court will note, however, that if federal maritime law were to apply, the Court would adopt the same subrogation rules as outlined above and hold that the Underwriters may enforce their subrogation rights under the circumstances of this case.

(1) United is liable to Global for $32,478.60, which represents 37 percent of Global's loss-of-use damages;

(2) United is liable to the Underwriters for $63,798.82, which represents 37 percent of Global's property damages that the Underwriters, as the subrogated insurers, are entitled to recover; and

(3) the Underwriters are liable to United for $436,262.80, which represents 67 percent of United's damages that the Underwriters, as the collision liability insurers of Global, are to pay.

As noted above, the parties have agreed that recovery should be without interests and without costs. Accordingly, no interests or costs shall be awarded.

New Orleans, Louisiana, this 6th day of June, 2011.

_____
UNITED STATES DISTRICT JUDGE